AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT

for the

Southern District of Florida

FILED BY AR D.C.
Feb 27, 2025
ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - FTL

United States of America
v.
Steven LAZARIDES

*Defendant(s)*

Case No. 25-MJ-6136-VALLE

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of February 2024 through April 2024 in the county of Broward in the Southern District of Florida, the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| Title 18, United States Code, Section 1956(h) | Consiracy to Commit Money Laundering |

This criminal complaint is based on these facts:

See attached affidavit.

☑ Continued on the attached sheet.

[signature]
*Complainant's signature*

Brandon Acquaviva Special Agent FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: February 27, 2025

[signature]
*Judge's signature*

City and state: Fort Lauderdale, Florida

Alicia O. Valle
*Printed name and title*

**AFFIDAVIT**

I, Brandon Acquaviva, being duly sworn, do hereby depose and say:

**BACKGROUND**

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have held this position since September 2021. I am currently assigned to the Federal Bureau of Investigation, at the FBI Tampa Field Office, Sarasota Resident Agency. During my career, I have assisted in criminal investigations involving, or relating to gangs, narcotics, cybercrimes and crimes against children. I have completed extensive training at the FBI academy, located in Quantico, Virginia. During my training, I have received training on different aspects of criminal investigations, to include interviewing and interrogations of subjects. Prior to my tenure as a Special Agent with the FBI, I was employed as a Deputy Sheriff with the Hillsborough County Sheriff's Office, located in Tampa, Florida. As a federal agent, your affiant is authorized to investigate violations of laws of the United States and to execute warrants issued under the authority of the United States.

2. The information in this affidavit is based upon my personal knowledge, as well as information learned from other law enforcement agents, investigators, witnesses, and documents. This affidavit is submitted for the limited purpose of showing that there is sufficient probable cause for the arrest of ALMEIDA VIRISSIMO ("VIRISSIMO") for the offenses of Distributing a Controlled Substance in violation of Title 21, United States Code, Section 841(a),

Conspiracy to Distribute a Controlled Substance, in violation of Title 21, United States Code, Section 846, Money Laundering (Sting Provision), in violation of Title 18, United States Code, Section 1956(a)(3)(b), and Conspiracy to Commit Money Laundering, in violation of Title 18, United States Code, Section 1956(h). I further submit that there is sufficient probable cause for the arrest of VIRISSIMO's husband, STEVEN LAZARIDES ("LAZARIDES"), for the offense of Conspiracy to Commit Money Laundering, in violation of Title 18, United States Code, Section 1956(h).

3. This affidavit does not include each and every fact known to me and law enforcement about this investigation. All dates and amounts in this affidavit are approximate.

**Cocaine Sale #1**

4. On May 18, 2023, a confidential source ("CS-1") had a consensually monitored phone conversation with VIRISSIMO regarding the purchase of one ounce of cocaine for $1,200 of U.S. currency. VIRISSIMO and CS-1 agreed to meet later that day for the sale, and they agreed to a sale price of $1,200 for the ounce of cocaine.

5. VIRISSIMO arrived at the meeting location driving a vehicle that was registered to her, according to records from the Florida Driver and Vehicle Information Database ("DAVID"), Kia Sportage SUV bearing license plate number NGYF48 ("Kia"). When VIRISSIMO arrived, she entered CS-1's vehicle to conduct the transaction. During the meeting, VIRISSIMO counted the $1,200 payment given to her by CS-1 and provided CS-1 with a white envelope with a clear plastic

bag inside containing a white powdery substance of suspected cocaine. The meeting was audio and video recorded.

6. Following the purchase, CS-1 departed the meeting location and surrendered the suspected cocaine to law enforcement. The suspected cocaine weighed approximately 30.48 grams. Subsequent DEA lab testing confirmed the substance tested positive for cocaine.

**Cocaine Sale #2**

7. On June 1, 2023, CS-1 had a consensually monitored phone conversation with VIRISSIMO regarding the purchase of two ounces of cocaine for $2,400 of U.S. currency. VIRISSIMO and CS-1 agreed to meet on June 1, 2023 for the sale.

8. The meeting location was at a business called Alviport LLC[1], which is located at 2764 Davie Boulevard, Fort Lauderdale, Florida 33312 ("Alviport-1"). According to a law enforcement check of Florida SunBiz records, VIRISSIMO was the registered agent of Alviport-1. VIRISSIMO's vehicle—the same used during Cocaine Sale #1—was observed parked at Alviport-1. At VIRISSIMO's request, CS-1 entered Alviport-1 to make the cocaine purchase.

9. Inside Alviport-1, an unknown white female provided CS-1 with two white envelopes with two clear plastic bags inside, which were filled with a white powdery substance of suspected cocaine. CS-1 purchased the suspected cocaine for $2,400. The meeting was audio and video recorded.

[1] There is a second Alviport location, which is discussed later in this affidavit.

10. Following the purchase, CS-1 departed the meeting location and surrendered the suspected cocaine to law enforcement. The suspected cocaine weighed approximately 60.2 grams. Subsequent DEA lab testing confirmed the substance tested positive for cocaine.

**Cocaine Sale #3**

11. On June 8, 2023, CS-1 had a consensually monitored phone conversation with VIRISSIMO regarding the purchase of cocaine. VIRISSIMO and CS-1 agreed to meet on June 8, 2023 at a shopping plaza located at 2750 Davie Boulevard, Fort Lauderdale, Florida 33312[2] for the sale.

12. Prior to CS-1's arrival, VIRISSIMO's Kia was observed parked at the shopping plaza. CS-1 arrived at the plaza, and VIRISSIMO walked towards CS-1's vehicle and entered the passenger side. VIRISSIMO provided CS-1 with approximately .299 grams of white powdery substance of suspected cocaine in exchange for $100 and exited CS-1's vehicle. The meeting was audio and video recorded.

13. Following the purchase, CS-1 departed the meeting location and surrendered the suspected cocaine to law enforcement. DEA laboratory analysis confirmed the substance tested positive for cocaine.

[2] Alviport-1 is located at this shopping center.

**Cocaine Sale #4**

14. On June 15, 2023, CS-1 had a consensually monitored phone conversation with VIRISSIMO regarding the purchase of cocaine. VIRISSIMO and CS-1 agreed to meet at Alviport-1 on June 15, 2023 for the sale.

15. Law enforcement observed VIRISSIMO arrive at Alviport-1 and enter the business. Once CS-1 arrived at Alviport-1, he/she entered the business. VIRISSIMO provided CS-1 with approximately 89.1 grams of a white powdery substance of suspected cocaine in exchange for $3,600. The meeting was audio and video recorded.

16. Following the purchase, CS-1 departed the meeting location and surrendered the suspected cocaine to law enforcement. DEA laboratory analysis confirmed the substance tested positive for cocaine.

**Cocaine Sale #5**

17. On July 12, 2023, CS-1 had a consensually monitored phone conversation with VIRISSIMO regarding the purchase of cocaine. VIRISSIMO and CS-1 agreed to meet at Alviport-1 on July 12, 2023 for the sale.

18. After CS-1 arrived at Alviport-1, VIRISSIMO walked outside and approached CS-1's vehicle. VIRISSIMO provided CS-1 with approximately 19.04 grams of white powdery substance of suspected cocaine in exchange for $800. After the transaction, VIRISSIMO went back inside Alviport-1. The meeting was audio and video recorded.

19. Following the purchase, CS-1 departed the meeting location and surrendered the suspected cocaine to law enforcement. DEA laboratory analysis confirmed the substance tested positive for cocaine.

**Cocaine Sale #6**

20. On July 31, 2023, CS-1 had a consensually monitored phone conversation with VIRISSIMO regarding the purchase of one ounce of cocaine for $1,200. VIRISSIMO and CS-1 initially agreed to meet at Alviport-1 on July 31, 2023 for the sale.

21. Prior to meeting, VIRISSIMO contacted CS-1 and changed the meeting location to another building with "Alviport LLC" on the door ("Alviport-2"), which is located at 710 Southwest 27th Avenue, Fort Lauderdale, Florida.

22. After CS-1 arrived and entered the business, VIRISSIMO provided CS-1 with approximately 27.97 grams of a white powdery substance of suspected cocaine in exchange for $1,200. The meeting was audio and video recorded.

23. Following the purchase, CS-1 departed the meeting location and surrendered the suspected cocaine to law enforcement. DEA laboratory analysis confirmed the substance tested positive for cocaine.

**Cocaine Sale #7**

24. On August 23, 2023, CS-1 had a consensually monitored phone conversation with VIRISSIMO regarding the purchase of half a kilogram of cocaine. VIRISSIMO and CS-1 agreed to meet the same day at Alviport-1 for the sale.

25. CS-1 arrived at Alviport-1 and walked inside. Once inside, CS-1 met with VIRISSIMO, who then introduced CS-1 to Individual-1. VIRISSIMO, Individual-1, and CS-1 agreed upon a price of $13,000 for the half kilogram of cocaine. However, CS-1 only had $11,500 to make the purchase. VIRISSIMO and Individual-1 agreed CS-1 could bring the "balance" at a later date. VIRISSIMO provided CS-1 with approximately 434.1 grams of a white powdery substance in exchange for $11,500. VIRISSIMO stated she trusted CS-1 and advised CS-1 to only give money to her, Individual-1, or the younger woman at the front of the office and no one else. The meeting was video and audio recorded.

26. Following the purchase, CS-1 departed the meeting location and surrendered the suspected cocaine to law enforcement. DEA laboratory analysis confirmed the substance tested positive for cocaine.

27. On August 30, 2023, law enforcement conducted physical surveillance at Alviport-1 to monitor CS-1's payment of $1,500 to VIRSISSIMO and Individual-1, which represented the "balance" that was owed for the half kilogram of cocaine purchased. The meeting was video and audio recorded.

28. After arriving at Alviport-1, Individual-1 met with CS-1 in the parking lot. CS-1 stayed within the vehicle, while CS-1 paid Individual-1 $1,500 through the vehicle window. After the transaction, Individual-1 walked in the direction of Alviport-1. This meeting was audio and video recorded.

**<u>Cocaine Provided to CS-1</u>**

29. On September 19, 2023, surveillance was initiated at Alviport-1 to monitor a controlled meeting between CS-1, Individual-1, and VIRISSIMO.

30. During the meeting, CS-1, Individual-1, and VIRISSIMO discussed doing business "once or twice a month," referring to cocaine sales. This meeting was audio and video recorded.

31. After the meeting, CS-1 leaves and enters his vehicle. Shortly afterwards, VIRISSIMO, and Individual-1 wave down CS-1's vehicle in the parking lot before it leaves. Individual-1 approaches the vehicle and enters the passenger side of the vehicle. Individual-1 gave CS-1 a "sample" of a white powdery substance of suspected cocaine in a clear plastic bag. Individual-1 then leaves the CHS' vehicle and walks away. This was also audio and video recorded.

32. Following this encounter, CS-1 surrenders the suspected cocaine to law enforcement. DEA laboratory analysis confirmed the substance weighed approximately .409 grams and tested positive for cocaine.

**Cocaine Sale #8**

33. On January 16, 2024, CS-1 had a consensually monitored phone conversation with VIRISSIMO regarding the purchase of cocaine. CS-1 and VIRISSIMO agreed to meet on January 16, 2024 for the sale.

34. CS-1 arrived and went inside Alviport-1. A few minutes after CS-1 arrived, law enforcement observed a white Chevy Cruz, bearing Florida License plate "08DEVZ" arriving at Alviport-1. The vehicle was registered to Individual-1, and law enforcement identified Individual-1 as the driver. VIRISSIMO was then observed walking out of Alviport-1 and entering Individual-1's vehicle. A few moments later, VIRISSIMO was observed exiting the vehicle and walking back into Alviport-1 where CS-1 was waiting. VIRISSIMO then provided CS-1 with

approximately 55.8 grams of a white powdery substance of suspected cocaine for $2,400. The meeting between VIRISSIMO and CS-1 was audio and video recorded.

35. Following the purchase, CS-1 departed the meeting location and surrendered the suspected cocaine to law enforcement. DEA laboratory analysis confirmed the white powdery substance tested positive for cocaine.

**February 27, 2024 Meeting to Discuss Drug Money Laundering**

36. On February 27, 2024, a second law enforcement confidential source posing as CS-1's associate ("CS-2") and CS-1 met with VIRISSIMO and her husband, LAZARIDES, at Alviport-1. The purpose of the meeting was to discuss the laundering of money earned from cocaine drug sales.

37. Initially, only CS-1, CS-2, and VIRISSIMO were present for the meeting. During this time, CS-2 told VIRISSIMO that he/she handled the cash for a gulf cartel group from Medellin which dealt solely in cocaine and needed assistance in moving the money. Specifically, the following conversation took place between CS-2 and VIRISSIMO regarding the source of the money and the ways VIRISSIMO ("AV") could launder the money, including the use of checks:

| | | |
|---|---|---|
| CS-2 | ...de Colombia, el Cartel del Golfo de Medellín, ¿no? Y lo hago con ese grupo nada más porque ellos solamente mueven cocaína. | ...of Colombia, the Gulf Cartel in Medellin, okay? And the reason I only work with that group is because they only move cocaine. |
| AV | Uh-huh. | Uh-huh. |
| CS-2 | Y yo no me meto en heroína, ni fentanil, ni nada de esas vainas. | And I don't get involved with heroin, or fentanyl, or any of that stuff. |
| AV | Uh-huh. | Uh-huh. |
| CS-2 | Y yo no más recojo el dinero que ellos tienen por esa razón. ¿Okay? | And I only pick up the money they have as a result of that. Okay? |
| AV | Uh-huh. | Uh-huh. |

| | | |
|---|---|---|
| CS-2 | Yo lo recojo aquí en Miami a la gente que vende el perico en la calle. | I pick it up here in Miami from the people who sell the "perico" (cocaine) here on the streets. |
| AV | Uh-huh. | Uh-huh. |
| CS-2 | Y esa es la plata que yo muevo. Yo la bajo hasta Colombia. Resulta que yo, eh, últimamente estoy recibiendo demasiado y lo... y le pregunté a él. Necesito a alguien que me ayude con la parte que yo no puedo manejar, ¿no? A mí me está sobrando dinero, no, uh, y estoy moviendo hasta $500,000 dólares, tú sabes, cada dos semanas. Pero yo puedo comenzar a entregar de a 100... | And that's the money that I move. I get it to Colombia. It just so happens that lately I've been receiving too much [money] so I asked him if he knew someone who could help me with the part that I can't handle personally, you know? I have money left over, right? and I'm moving up to $500,000 dollars, every two weeks or so. But I can start giving you 100 at a time... |
| AV | Uh-huh. | Uh-huh. |
| CS-2 | ...para arriba. Ahora, ¿cómo podrías tú mover ese dinero? ¿Cuánto me cobras? ¿Y cuánto te demoras en devolvérmelo? | ... [100] and up. Now, how can you move that money? How much would you charge me? And how long would it take you to return it to me? |
| AV | ¿Usted necesita que le de la vuelta en Colombia, o acá? | Do you need me to do the deal ("Dar la Vuelta" in Colombia means to do the crooked part of a deal) return it to you in Colombia, or here? |
| CS-2 | No, acá. Acá. Yo la vuelta de Colombia. Esta vuelta en Colombia [UI] acá. | No. Here, here. As far as the Colombia part, I [UI] the Colombia part [UI] here. |
| AV | Ya. Una de las cosas que yo podría ayudarle a mover eso era pri... primero, armándole una compañía... de construcción. Y todas esas personas que paguen, pagarían a nombre de la compañía con cheque limpio porque eso es cheque de trabajo. | Okay. One of the ways in which I could help you would be, first, I would set you up with a corporation, a construction company. Where all the incoming payments would be made out to the company name using clean checks, because these would all be work related checks. |

38. During this same conversation, VIRISSIMO also described another money laundering scheme to move the drug money by buying a boat in South Florida and selling it in Colombia.

| | | |
|---|---|---|
| AV | Espere que venga aquí, eh, Don... Don Caballo a ver. Porque él también me estaba hablando a mí de otra estrategia. Digamos, compran un barco, porque lo de él es barco. | Let's wait for "THE MAN" to get here. Because he was telling me about another strategy. Let's say, you buy a boat, because his thing is boats. |
| CS-2 | Uh-huh. | Uh-huh. |

| | | |
|---|---|---|
| AV | Compran un barco, y lo pueden poner allá. Al ponerlo allá... | You buy a boat, and you can put it over there. When putting it over there... |
| CS-2 | Sí, claro. | Yes, of course. |
| AV | ...[UI] lo compran acá en efectivo, entregan una parte, y lo bajan allá, allá lo venden, y tienen el dinero limpio del... | ...[UI] you buy it over here in cash, a down payment, and you take it down there, you sell it over there, and now you have clean money from... |

39. VIRISSIMO also advised CS-1 and CS-2 that once she received the cash it would take 10-12 days to return the money to CS-2 in the form of cashier's checks and regular checks.

40. Later in the meeting, LAZARIDES ("ST") arrived and participated in the conversation with CS-1, CS-2, and VIRISSIMO. After LAZARIDES joined the conversation, CS-2 repeated that the money he was providing to them would come from cocaine sales. LAZARIDES understood and discussed ways to get the money laundered, again including the use of checks.

| | | |
|---|---|---|
| CS-2 | My problem is that I... that I... my problem is that, uh, I'm getting, uh... sometimes I get over what I got in my bank accounts, and I need to receive the cash and start processing the money with the money that I have in my bank account. Now, when I receive too much, then I need people like you to help me out. I give you 100, 150, you know, it just depends on the amount that I receive. You process it, you give me checks, or you wire the money to me. Either one, you know. Uh, if you have a problem, you let me know, okay? As I was explaining to her, this is money, uh... this is money that comes from drug traffickers. I pick it up in the streets from here. This is not, you know... | My problem is that I... that I... my problem is that, uh, I'm getting, uh... sometimes I get over what I got in my bank accounts, and I need to receive the cash and start processing the money with the money that I have in my bank account. Now, when I receive too much, then I need people like you to help me out. I give you 100, 150, you know, it just depends on the amount that I receive. You process it, you give me checks, or you wire the money to me. Either one, you know. Uh, if you have a problem, you let me know, okay? As I was explaining to her, this is money, uh... this is money that comes from drug traffickers. I pick it up in the streets from here. This is not, you know... |
| ST | Okay. | Okay. |
| CS-2 | And I said to her, I have my scruples. I don't handle money that comes from heroin, or... or whatever other drugs. I only handle cocaine, and that's it, but as I said | And I said to her, I have my scruples. I don't handle money that comes from heroin, or... or whatever other drugs. I only handle cocaine, and that's it, but as I said |

| | | |
|---|---|---|
| | to her, if you need more time, you let me know. I'm... I understand what's going on. But what I need to do, uh, I need to know is how much you're gonna charge me for that. | to her, if you need more time, you let me know. I'm... I understand what's going on. But what I need to do, uh, I need to know is how much you're gonna charge me for that. |
| ST | Well, thank you for that. Now, couple more questions. | Well, thank you for that. Now, couple more questions. |
| CS-2 | All right. [laughs] Ask as many questions as you want, you know. I'm here to answer them. | All right. [laughs] Ask as many questions as you want, you know. I'm here to answer them. |
| ST | No, it's to... again, it comes down to what process works best, you know? That's why I ask these questions. Whenever you want to change the money, is time critical? | No, it's to... again, it comes down to what process works best, you know? That's why I ask these questions. Whenever you want to change the money, is time critical? |
| CS-2 | Well, uh, okay, let me... let me put it this way to you, okay? I just received $750,000 dollars, okay? I'm already processing part of that money. I got $100,000 dollars left that I need somebody else to process for me, which means that I have time to move the other money until you guys give me back in checks or wire transfers, whatever I give you. You follow me? | Well, uh, okay, let me... let me put it this way to you, okay? I just received $750,000 dollars, okay? I'm already processing part of that money. I got $100,000 dollars left that I need somebody else to process for me, which means that I have time to move the other money until you guys give me back in checks or wire transfers, whatever I give you. You follow me? |
| ST | That's this time. | That's this time. |
| CS-2 | Uh, we can have a week, we can have, you know... if you need more time, you call me, and you let me know. I'm gonna give you my number so you can contact me any time, okay? That's not a problem. | Uh, we can have a week, we can have, you know... if you need more time, you call me, and you let me know. I'm gonna give you my number so you can contact me any time, okay? That's not a problem. |
| ST | Got it. | Got it. |
| CS-2 | Next question. [laughs] | Next question. [laughs] |
| ST | Uh... you see, we can do this. That's not a problem. Right? | Uh... you see, we can do this. That's not a problem. Right? |
| CS-2 | You don't have a problem with that? | You don't have a problem with that? |
| ST | Nah. | Nah. |
| CS-2 | Okay, good. | Okay, good. |
| ST | Not at all. It's just whatever we start, that process just continues. | Not at all. It's just whatever we start, that process just continues. |
| CS-2 | Oh, yeah. | Oh, yeah. |
| ST | But if we don't lay it all out... | But if we don't lay it all out... |
| CS-2 | No, no. | No, no. |
| ST | ...you know, from the beginning... | ...you know, from the beginning... |
| CS-2 | This is... is not a one... one-shot deal. | This is... is not a one... one-shot deal. |
| ST | Yeah, I know, but, you know, I'm just saying because, you know, there is things we can do. Again, you know, we do a lot of payrolls for construction companies. So... | Yeah, I know, but, you know, I'm just saying because, you know, there is things we can do. Again, you know, we do a lot of payrolls for construction companies. So... |

| | | |
|---|---|---|
| CS-2 | Right. | Right. |
| ST | Yeah. And in the end of the day, them, they need cash for paying workers who don't have the papers, and whatever. | Yeah. And in the end of the day, them, they need cash for paying workers who don't have the papers, and whatever. |
| CS-2 | Sure. | Sure. |
| ST | But business works beautiful, yeah? Nobody [UI] anything. Do you have a business at all? | But business works beautiful, yeah? Nobody [UI] anything. Do you have a business at all? |
| CS-2 | Uh, I have a few companies that, uh, I need the checks made out to, or, uh, wired to. | Uh, I have a few companies that, uh, I need the checks made out to, or, uh, wired to. |
| ST | The reason I... the reason I ask that, because if you had nothing... | The reason I... the reason I ask that, because if you had nothing... |
| CS-2 | No. I do. | No. I do. |
| ST | ...then we have to form something in the construction. | ...then we have to form something in the construction. |
| CS-2 | I do. | I do. |
| AV | También te puedo meter como socio de las compañías que tengo, y los cheques van a ir a esa compañía, y también puede ser otra opción. | I could also put you down as a partner in one of my existing companies, and the checks will be made out to that company, that can be another option. |
| CS-2 | Ah, yo te puedo... | Ah, I can... |
| AV | Yo tengo control de esas compañías. | I have control of over those companies. |
| CS-2 | Yo te puedo, si quieres... | I can, if you want... |
| AV | Los cheques son buenos. | The checks are good. |
| CS-2 | Yo te podría, si quieres, dar, eh... eh... eh, invoices. I could give you invoices. | I could, if you want, give you, uh... uh... uh... uh, invoices. I could give you invoices. |
| ST | Yeah. | Yeah. |
| CS-2 | From my companies | From my companies |
| ST | That's what I'm saying. Like... | That's what I'm saying. Like... |
| CS-2 | And then you put that you gave me the wire transfer or the checks or whatever. | And then you put that you gave me the wire transfer or the checks or whatever. |
| ST | ...you... you... you're given an invoice, now you put a legitimate check or wire in the account. | ...you... you... you're given an invoice, now you put a legitimate check or wire in the account. |
| CS-2 | For supplies, whatever types of | For supplies, whatever types of |
| ST | Yeah. | Yeah. |
| CS-2 | ...supplies you want, you know. Transportation. | ...supplies you want, you know. Transportation. |
| ST | Yeah, that's it. Yeah. | Yeah, that's it. Yeah. |

41. LAZARIDES further advised CS-1 and CS-2 that he and his wife were partners and that they needed a "cut" from the transactions, referencing a fee,

which they, LAZARIDES and VIRISSIMO, would discuss and get back to CS-1 and CS-2 with the amount.

| | | |
|---|---|---|
| ST | The only answer you need is we need a cut, okay? I'll tell you this. Can we, after you guys leave, we will have a discussion, yeah? It's my partner and my wife. | The only answer you need is we need a cut, okay? I'll tell you this. Can we, after you guys leave, we will have a discussion, yeah? It's my partner and my wife. |

42. The meeting was audio and video recorded.

**February 28, 2024 Meeting to Discuss Drug Money Laundering**

43. On February 28, 2024, CS-1 and VIRISSIMO met at Alviport-1. VIRISSIMO requested the meeting to further discuss drug money laundering activity.

44. During the meeting, VIRISSIMO asked CS-1 if CS-2 was a "policeman" because, according to VIRISSIMO, her husband, LAZARIDES, had found it suspicious that if CS-2 had already cashed a large sum of money elsewhere then why would they come to VIRISSIMO with only $100,000.

45. VIRISSIMO told CS-1 she would charge 10% and required until Tuesday. VIRISSIMO also asked CS-1 about when they were going to purchase more of her product (cocaine).

**Laundering of $100,000 Cash**

46. On March 6, 2024, CS-2 met with VIRISSIMO at Alviport-1 to make the first cash drop of supposed drug earned money. At the meeting, CS-2 gave VIRISSIMO $100,000 in law enforcement provided funds, which was carried in a satchel. These funds were previously represented as narcotic proceeds during the February 27, 2024 meeting.

47. During this meeting, VIRISSIMO stated that she was talking to a friend of hers who owns a plastic company where the checks to CS-2 would come from. VIRISSIMO believes her friend would have the checks ready in 8 days. VIRISSIMO also stated "it will be done in three parts to avoid doing large amounts because it would be risky to send a single payment for 90." VIRISSIMO also requested CS-2 to provide invoices made out to some of the companies she would be using to issue checks to CS-2. CS-2 agreed to do so and later used government owned companies used for undercover operations to issue invoices to VIRISSIMO.

48. On March 15, 2024, CS-2 met with VIRISSIMO at ALVIRPORT-2. At the meeting, VIRISSIMO gave CS-2 $90,000.00 in checks from several different individuals/businesses. One check from came from a company ("Company-1") and another check came from a second company ("Company-2"). The checks issued from Company-1 and Company-2 were made out to the government owned companies that CS-2 represented to VIRISSIMO as his/her own companies.

49. VIRISSIMO asked CS-2 for two separate invoices made out to Company-1 and Company-2 in amounts that matched the face value of the checks. CS-2 then created two false invoices, one for Company-1 in an amount that matched the face value of the Company-1 check, and one for Company-2 in an amount that matched the amount the face value of the Company-2 check. This meeting was video and audio recorded.

**Laundering of $200,000**

50. On March 28, 2024, CS-2 met with VIRISSIMO at Alviport-1. At the meeting, CS-2 gave VIRISSIMO $200,000 in government monies, which CS-2 represented to VIRISSIMO as narcotic proceeds.

51. On April 5, 2024, CS-2 met with VIRISSIMO at Alviport-2. At the meeting, VIRISSIMO and CS-2 discussed the rates that are charged to launder drug proceeds and another option to launder narcotic funds. During these discussions, VIRISSIMO handed CS-2 twenty-one different checks coming from fourteen different third parties totaling $180,000. This meeting was video and audio recorded.

**[SPACE INTENTIONALLY LEFT BLANK]**

52. Based upon the foregoing facts, I submit there is probable cause to believe that ALMEIDA VIRISSIMO has committed the offenses of Distributing a Controlled Substance in violation of Title 21, United States Code, Section 841(a), Conspiracy to Distribute a Controlled Substance, in violation of Title 21, United States Code, Section 846, Money Laundering (Sting Provision), in violation of Title 18, United States Code, Section 1956(a)(3)(b), and Conspiracy to Commit Money Laundering, in violation of Title 18, United States Code, Section 1956(h). I further submit that there is sufficient probable cause for the arrest of VIRISSIMO's husband, STEVEN LAZARIDES, for the offense of Conspiracy to Commit Money Laundering, in violation of Title 18, United States Code, Section 1956(h).

FURTHER YOUR AFFIANT SAYETH NAUGHT.

Brandon Acquaviva
Special Agent
Federal Bureau of Investigation

Attested to by the applicant in accordance with the requirements of Fed.R.Crim.P. 4.1 by Face Time this 27th day of February, 2025.

HONORABLE ALICIA O.VALLE
UNITED STATES MAGISTRATE JUDGE